IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WILDCAT ENTERPRISES, LLC,            )
                                     )
            Plaintiff,               )
                                     )
      v.                             )   No. 11 C 4922
                                     )
GERALD H. WEBER JR., et              )
al.,                                 )
                                     )
            Defendants.              )

**MEMORANDUM OPINION AND ORDER**

First Midwest Bank ("First Midwest") and Sandor Mark Jacobson, a court-appointed receiver in a state court action against one of the defendants in this case ("the Receiver"), have moved pursuant to Rule 60 of the Federal Rules of Civil Procedure to vacate a joint turnover order that I entered in this case in March 2014. For the reasons discussed below, I grant the motion.

I.

The underlying action in this case was filed in July 2011 by PNC Equipment Finance, LLC ("PNC") against, *inter alia*, Gerald Weber Jr. ("Weber"), Ronald Swenson ("Swenson"), and Rubloff Development Group ("RDG"), an entity owned by Weber and Swenson (Weber, Swenson, and RDG together, "the Judgment

Debtors").[1] The suit alleged that Weber and Swenson defaulted on a loan they had received from PNC. On March 13, 2012, I granted the parties' motion for entry of a $25,546,359.87 consent judgment in PNC's favor (the "PNC Judgment").

In November 2013, PNC assigned its judgment to Wildcat Capital Enterprises, LLC ("Wildcat"). *See* Doc. No. 85. In March 2014, Wildcat and the Judgment Debtors jointly submitted an Agreed Turnover Order ("Turnover Order") to the Court. Pursuant to the Turnover Order, the Judgment Debtors agreed to transfer certain assets to Wildcat in exchange for a $500,000 credit against the PNC Judgment. *See* Turnover Order (Doc. No. 93) ¶ D. The assets included certain checking account funds, vehicles, and real property belonging to Weber and Swenson, as well as certain leases and property held by RDG. The Turnover Order provided that "[t]he Citations shall remain in full force and effect pending further Order of Court." *Id*. ¶ E.

During this period, First Midwest sued Weber and Swenson in separate state-court proceedings and obtained judgments against each of them in the amount of $3,107,075.04. In addition, the Receiver obtained a judgment against RDG in the amount of $674,446.19. In March 2015, First Midwest and the Receiver

---

[1] Several other Rubloff entities are also named as defendants in PNC's complaint. For purposes of this motion, however, only RDG is relevant.

2

initiated citation proceedings against the Judgment Debtors. In June 2015, Wildcat intervened in the proceedings and, citing the Turnover Order, persuaded the state courts that its claims to the Judgment Debtors' assets were superior to First Midwest's and the Receiver's.

During the course of the citation proceedings, however, First Midwest and the Receiver uncovered information indicating that Wildcat was essentially a shell corporation created by Weber and Swenson to protect their assets from creditors by purchasing the PNC Judgment. First Midwest and the Receiver then moved to intervene in this action, seeking to conduct further discovery into the matter with a view toward seeking vacatur of the Turnover Order. I granted the motion to intervene. *See Wildcat Enterprises, LLC v. Weber*, No. 11 C 4922, 2016 WL 8711474 (N.D. Ill. Mar. 4, 2016). Having completed additional discovery, First Midwest and the Receiver now move to vacate the Turnover Order.[2]

**II.**

Rule 60 of the Federal Rules of Civil Procedure provides various grounds on which a party may seek relief from a judgment or order. Here, First Midwest and the Receiver seek vacatur of

---

[2] First Midwest's and the Receiver's motion also sought to terminate Wildcat's citations pursuant to Illinois Supreme Court Rule 277. During a prior hearing, I granted that request. *See* Transcript of Hearing, Jan. 25, 2017 (Doc. No. 167).

the Turnover Order under three separate provisions of Rule 60: Rule 60(d)(3), which provides that a judgment may be set aside for "fraud on the court"; Rule 60(b)(5), which provides for relief from an order where "the judgment has been satisfied, released or discharged"; and Rule 60(b)(6), a catchall provision based on "any other reason that justifies relief."

**A.   Waiver**

The Judgment Debtors first argue that the motion to vacate should be denied because First Midwest and the Receiver have abandoned the original basis on which they sought to intervene in the proceedings. Specifically, the Judgment Debtors maintain that First Midwest and the Receiver originally were interested only in source of the funds used to purchase the PNC judgment, based on the belief that the funds had come from Weber and Swenson themselves. According to the Judgment Debtors, discovery has shown that the funding used by Wildcat to purchase the PNC Judgment came exclusively from Weber's wife, Patti Weber ("Patti"), and Swenson's wife, JoAnn Swenson ("JoAnn"). As a result, the Judgment Debtors contend, First Midwest and the Receiver have now shifted their attention to Wildcat's and the Judgment Debtors' conduct following entry of the Turnover Order.

This argument is mistaken in at least two respects. First, discovery has not shown that the funding used by Wildcat to purchase the PNC Judgment came exclusively from Weber's and

4

Swenson's spouses. As noted below, *see* n. 6, *infra*, the source of the funds remains undetermined. Second, the Judgment Debtors are mistaken in asserting that First Midwest and the Receiver initially were interested only in the source of the funds used to purchase the PNC Judgment. On April 11, 2016, I entered an order defining the scope of discovery. *See* Doc. No. 129. That order made clear that First Midwest and the Receiver would be permitted to inquire not only into the funding for the PNC judgment but also into the circumstances surrounding Wildcat's creation and ownership, and Wildcat's collection efforts after obtaining the PNC judgment.

Having concluded that the Judgment Debtors' waiver and abandonment argument fails, I consider the merits of the parties' Rule 60 arguments. For reasons that will become clear in what follows, I need only consider Rule 60(d)(3).[3]

**B. Rule 60(d)(3)**

---

[3] Although the motion to vacate is brought by both First Midwest and the Receiver, the Receiver does not join in First Midwest's contention that the judgment should be vacated for fraud on the court. According to the parties' brief, "[w]hile the Receiver believes this argument to be legally and factually correct, the Receiver is concerned that as an officer of the court he does not currently have court authority to make the fraud allegations set forth in this section." Movants' Br. at 9 n.3. Since my analysis is confined to the fraud-on-the-court argument, I refer to First America alone as the movant for purposes of this discussion.

Unlike other grounds for relief under Rule 60, there is no time limit on motions to vacate pursuant to Rule 60(d)(3). *See, e.g.*, *In re Golf 255, Inc.*, 652 F.3d 806, 809 (7th Cir. 2011) ("[A] motion to set aside a judgment on the ground of fraud on the court has no deadline."). However, to prevent "fraud on the court" from "becom[ing] an open sesame to collateral attacks," "fraud" in this context has been defined narrowly. *Oxxford Clothes XX, Inc. v. Expeditors Int'l of Washington, Inc.*, 127 F.3d 574, 578 (7th Cir. 1997). As the Seventh Circuit has explained, "fraud on the court" is reserved for "the kind of fraud that ordinarily couldn't be discovered, despite diligent inquiry, within a year, and in some cases within many years -- cases in which there are no grounds for suspicion and the fraud comes to light serendipitously." *In re Golf 255*, 652 F.3d at 809. In addition, fraud on the court involves "conduct that might be thought to corrupt the judicial process itself, as where a party bribes a judge or inserts bogus documents into the record." *Oxxford Clothes*, 127 F.3d at 578. Fraud on the court must be proved by clear and convincing evidence. *See, e.g., Wickens v. Shell Oil Co*., 620 F.3d 747, 759 (7th Cir. 2010).

The evidence adduced by First Midwest establishes without any question that Wildcat was created by Weber and Swenson for the specific purpose of purchasing the PNC Judgment and using it to thwart creditors. Wildcat has no employees. Its three members

-- Patti, JoAnn, and a third individual, Zachary Knutson -- know almost nothing about even the most elementary aspects of Wildcat's creation and operation. Essentially, Patti's and JoAnn's involvement with Wildcat was limited to their initial capital contributions. Although Patti occasionally writes checks and performs other tasks on behalf of Wildcat, virtually everything she does in this capacity is at Weber's direction.

The evidence further shows that Weber effectively manages Wildcat, and that he has used Wildcat to pay his and Swenson's personal debts and expenses. Among other things, Wildcat has paid off loans guaranteed by Weber and Swenson, and has paid legal fees they incurred in state-court litigation with various creditors. Notably, it is undisputed that these payments on Weber's and Swenson's behalf were made without any expectation of repayment.

Finally, the evidence shows that attorney Brad Koch ("Koch"), who represents Weber and Swenson in the state-court citation proceedings, also surreptitiously represents Wildcat in other actions. For example, First Midwest cites email correspondence indicating that Koch participated in drafting Wildcat's motion to intervene in the state-court citation proceedings.[4] Indeed, Wildcat concedes that it was Koch who came

---

[4] Wildcat objects to First Midwest's reliance on these communications, contending that they are protected by the

up with the idea of forming Wildcat to purchase the PNC judgment in the first place.

Wildcat does not dispute any of the foregoing facts. In his deposition, Weber sanguinely conceded that Wildcat was created, and the Turnover Order was procured, for the purpose of fending off creditors. When asked whether "Wildcat's acquisition of the judgment would function to block other creditors of you from accessing your assets," he replied:

> A.   I wouldn't characterize it exactly that way, but that's not unfair. But I would say it was -- in my thinking it was a means by which other creditors would settle for significantly less money, so in effect it could have that, and it has.
>
> Q.   So in a way to effectively create leverage with your creditors?
>
> A.   Yeah, that they would see or think that the probability of collecting anything from us at that point was not going to bear fruit.

Weber Dep. at 17:20 - 18:5.

Wildcat likewise concedes that "Patti and JoAnn, neither of whom have experience with commercial real estate, are not active

---

attorney-client privilege, the joint-defense privilege, and the common interest rule. Although these documents are not essential to my ruling, I note that Wildcat's argument on this point is unpersuasive. Wildcat cites an agreement executed by the parties providing that production of documents in discovery would not result in a waiver of any privileges. But the question of waiver arises only after a showing that the documents are privileged. Although Wildcat asserts that the privileges apply, it offers no argument in support of its position. Accordingly, I conclude that the documents are not privileged or otherwise subject to protection and that First Midwest's reliance on them is proper.

in the management of Wildcat's real estate assets, and that ... [Weber], who has over 30 years of experience managing commercial real estate, is an active participant in the management of those assets for Wildcat." Resp. Br. at 8.

According to Wildcat, however, there was nothing improper about any of this. Wildcat maintains that its start-up funding came exclusively from Patti and JoAnn,[5] and insists that Patti and JoAnn are free to spend their money as they wish. It contends that it was reasonable for Patti and JoAnn to use their own personal funds to create Wildcat and to purchase the judgment against Weber and Swenson, since by doing so, they could potentially recoup some of their contributions. Wildcat does not address the fact that any funds recouped by Patti and JoAnn would also redound to Weber's and Swenson's benefit.

Likewise, Wildcat argues that it has "an absolute right" to manage its affairs as it wishes. Thus, Wildcat was free to enlist Weber as its manager instead of hiring someone from the

---

[5] Wildcat claims that "[a]fter the completion of discovery, it was undisputed that the source of the funds paid by Wildcat to PNC was not any of the Judgment Debtors but rather from the personal funds of Patti Weber ... and JoAnn Swenson ..., wives of Ron and Jerry respectively and members of Wildcat." Resp. Br. at 2. In point of fact, the source of the funds remains vigorously contested. While Patti and JoAnn testified that the funds belonged to them, they were unable (with the exception of $100,000 that Patti had in a money market fund) to explain where they had obtained the funds. Ultimately, however, my conclusion does not turn on the source of Wildcat's start-up funds.

9

outside; and it was free to pay off Weber's and Swenson's debts. Wildcat sees nothing askew about the fact that this arrangement effectively made Weber responsible for enforcing the PNC Judgment against himself and Swenson.

Finally, Wildcat denies that there was anything improper about the parties' failure to inform the court of Weber's and Swenson's involvement with Wildcat. Wildcat states that even if it "had disclosed that Patti and JoAnn were two of its members and had acquired the PNC Judgment in the PNC Settlement by paying $830,000 to PNC from ... their own personal funds, the result would have been the same -- the Turnover Order would have been entered." Wildcat Resp. Br. at 9-10.

This is incorrect: if I had been aware of the circumstances recounted above, I most certainly would not have approved the Turnover Order. What happened here was unquestionably fraudulent. Although this would seem too obvious to require further elaboration, in light of Wildcat's insouciance regarding the matter, I point out several fraudulent characteristics of the Turnover Order and the manner in which it was procured. In particular, I note that several of the "badges of fraud" outlined in Illinois' Uniform Fraudulent Transfer Act (IUFTA), 740 ILCS 160/1 et seq., are evident here.[6]

---

[6] The Seventh Circuit has cautioned against conflating fraud with the doctrine of fraudulent transfer or fraudulent conveyance

10

First, the Turnover Order involved the transfer of assets to insiders. *See* 740 ILCS 160/5(b)(1) (including as a badge of fraud whether "the transfer or obligation was to an insider"). Here, Weber and Swenson transferred their assets to their spouses. Spouses are insiders *par excellence*. *See, e.g.*, 740 ILCS 160/2(g)(1)(A) (defining "insider" as "a relative of the debtor or of a general partner of the debtor"). Given Patti's and JoAnn's status as insiders, Wildcat's insistence that they are "distinct human beings" from Weber and Swenson is beside the point. By transferring the assets to their spouses, Weber and Swenson were merely giving with one hand and receiving with the other.

Second, Weber and Swenson have retained possession or control of the transferred assets after the transfer. *See, e.g.*, 740 ILCS 160/5(b)(2) (including among the badges of fraud whether "the debtor retained possession or control of the property transferred after the transfer"); *see also United Gen. Title Ins. Co. v. Karanasos*, 561 B.R. 316, 327 (E.D.N.Y. 2016) ("A classic example of fraud is the transfer of property by the

---

since the elements of the claims are distinct. *See Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 419 F.3d 594, 600 (7th Cir. 2005). Here, however, First Midwest is not asserting a substantive cause of action for fraud or for fraudulent transfer. I refer to the "badges of fraud" set forth in the IUFTA only by way of illustration.

debtor to his spouse while insolvent, while retaining the use and enjoyment of the property.") (quotation marks and alteration omitted). As explained above, Weber effectively controls Wildcat's operations, and he has used Wildcat's assets to pay off his and Swenson's personal debts. Further, any funds collected by Wildcat (e.g., from the leases it received from Weber and Swenson pursuant to the Turnover Order) are distributed to Patti and JoAnn, which are then used to cover expenses that are partly Weber's and Swenson's.

In addition, the parties concealed key information in obtaining the Turnover Order from the court. *See, e.g.*, 740 ILCS 160/5(b)(3) (providing that one of the badges of fraud is whether "the transfer or obligation was disclosed or concealed"). While the Turnover Order spelled out which assets would be transferred, none of the parties disclosed that the assets were merely being transferred from Weber and Swenson to their spouses. Nor did they disclose that Wildcat had been created for the purpose of purchasing the PNC Judgment, or that the reason for purchasing the judgment was to block Weber's and Swenson's creditors. Wildcat's claim that it was under no obligation to disclose any of this information is without merit. At the very least, Wildcat's counsel had "a continuing duty to inform the Court of any development which may conceivably [have] affect[ed] the outcome of the litigation." *Cleveland Hair*

*Clinic, Inc. v. Puig*, 200 F.3d 1063, 1067–68 (7th Cir. 2000) (citing *Tiverton Bd. of License Comm'rs v. Pastore*, 469 U.S. 238, 240 (1985)). I do not find credible the notion that counsel for the parties had no reason to believe that the facts described above might have affected my decision.

In addition, at the time of the turnover order, Weber and Swenson had been sued in state-court actions by First Midwest and the Receiver. *See, e.g.*, 740 ILCS 160/5(b)(3) (one badge of fraud is whether "before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit"). On February 28, 2014, First Midwest brought its state-court suits against Weber and Swenson. Shortly thereafter, on March 25, 2014, Wildcat and the Judgment Debtors sought the Turnover Order in this court.

Finally, the Turnover Order involved the transfer of substantially all the Judgment Debtors' assets. *See, e.g.*, 740 ILCS 160/5(b)(5) (listing as one of the badges of fraud whether "the transfer was of substantially all the debtor's asset"). Wildcat states that once the assets were turned over to Wildcat, Weber and Swenson "were effectively rendered without any meaningful nonexempt assets." Wildcat Resp. Br. at 6.

These facts, all of which have been demonstrated by clear and convincing evidence, are more than sufficient to demonstrate that the Turnover Order was obtained by means of fraud.

Nevertheless, the question remains whether the parties' conduct constitutes fraud *on the court*. As noted above, the definition of "fraud" in this context is more limited than ordinary fraud. It is reserved for "cases in which there are no grounds for suspicion and the fraud comes to light serendipitously," and where the conduct "might be thought to corrupt the judicial process itself," *Oxxford Clothes*, 127 F.3d at 578. These conditions are present here.

First, the fraud at issue here could not reasonably have been discovered at the time the Turnover Order was entered. Based on Wildcat's and the Judgment Debtors' representations, there was no reason to suspect that they were in collusion; and no other party was in a position to bring the deception to light. *See, e.g.*, *In re Levander*, 180 F.3d 1114, 1120 (9th Cir. 1999) (corporation's false representations constituted fraud on the court where neither the opposing party nor the court was aware of underlying facts that would have called the representations into question).

Second, the scheme between Wildcat and the Judgment Debtors involved a subversion of the judicial process itself. Wildcat and the Judgment Debtors did not merely deceive this court in obtaining the Turnover Order; they went on to use the Turnover Order to deceive other courts into holding that Wildcat had a superior interest in the Judgment Debtors' assets. Their scheme

14

was designed to use the judicial machinery itself to fend off legitimate creditors. In addition, Wildcat's and the Judgment Debtors' attorneys, as officers of the court, played a key role in perpetrating the fraud. *See, e.g.*, *In re Golf 255*, 652 F.3d at 808 (observing that fraud on the court is "that species of fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court [i.e., lawyers]") (quotation marks omitted). The scheme originated with Mr. Koch, who also participated in furthering the scheme by simultaneously working for both the Judgment Debtors and Wildcat. Other attorneys for the parties furthered the scheme by failing to disclose Wildcat's relationship with the Judgment Debtors in seeking the Turnover Order.

In sum, through Wildcat, Weber and Swenson perpetrated a fraud on the court. *Cf. In re R & R Assocs. of Hampton*, 248 B.R. 1, 7 (Bankr. D.N.H. 2000) (trustee stated claim for fraud on the court where law firm helped transfer assets of debtor's partners to other entities and failed to disclose dealings when later seeking to represent debtor in bankruptcy proceedings); *In re Tri-Cran, Inc.*, 98 B.R. 609, 619 (Bankr. D. Mass. 1989) (finding fraud on the court where debtor arranged through insider dealing to sell property at lowest possible price, resulting in judge's "authorizing a sale that, had the truth about [the insider's]

relation to and dealings with the Debtor come to light, [she] would not have permitted to go forward").

For these reasons, I vacate the turnover order pursuant to Rule 60(d)(3).[7]

### III. Conclusion

For the reasons discussed above, First Midwest's and the Receiver's motion to vacate the Turnover Order is granted.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: April 28, 2017

---

[7] Having found vacatur appropriate pursuant to Rule 60(d)(3), I need not consider First Midwest's and the Receiver's arguments for vacatur under Rule 60(b)(5) and 60(b)(6). In any event, given the overlap between the arguments on these various points, discussing them separately would be redundant. Showing that Wildcat is the alter ego of Weber and Swenson for purposes of Rule 60(b)(5) would entail essentially the same showing of collusion on which the Rule 60(d)(3) argument is based. Similarly, the "extraordinary circumstances" cited in support of vacatur under Rule 60(b)(6) are essentially the same as those on which First Midwest's fraud-on-the-court argument is based.